UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Chapter 7

Kevin Jonatzke,                                     Case No. 10-73683

      Debtor.                                       Hon. Phillip J. Shefferly

_____/

Synergeering Group, LLC,                            Adversary Proceeding
                                                    No. 11-04387-PJS
      Plaintiff,

v.

Kevin Jonatzke,

      Defendant.

_____/

## TRIAL OPINION DETERMINING NON-DISCHARGEABLE DEBT

### Introduction

      Kevin Jonatzke is the Debtor in this Chapter 7 bankruptcy case. Synergeering Group, LLC

("Synergeering") brought this adversary proceeding against the Debtor seeking a determination of

non-dischargeability of debt alleged to be owed by the Debtor to Synergeering under § 523(a)(2)(A),

(4) and (6) of the Bankruptcy Code. This opinion constitutes the Court's findings of fact and

conclusions of law pursuant to Fed. R. Bankr. P. 7052. For the reasons set forth in this opinion, the

Court holds that Synergeering is entitled to a non-dischargeable judgment in its favor and against

the Debtor in the amount of $276,549.94 pursuant to § 523(a)(6).

## Jurisdiction

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local District Court Rule 83.50(a) (E.D. Mich.). Synergeering's complaint for a determination of a non-dischargeable debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## Facts

Synergeering is an automotive supplier involved in rapid prototyping and rapid manufacturing using a nylon plastic laser sintering process to produce prototypes and finished parts such as intake manifolds. Thomas A. Gogoe formed Synergeering in 2001 after he had obtained degrees in mechanical engineering and chemistry, and spent a number of years working in engineering design activities in the automotive industry. At first, Synergeering acted as a broker selling specific prototype parts, including metal castings and plastic parts. However, by the end of 2002, Synergeering began to manufacture its own parts. By 2003, Synergeering had acquired its own facility and had purchased a large frame laser sintering machine known as an EOS P700. At the time, there were no other EOS P700s used by United States-based automotive suppliers to produce fully functional intake manifolds.

After acquiring the EOS P700, it still took Synergeering a couple of years to become fully operational. During this time, Synergeering developed and refined its pre-processing techniques for computer designs, its post-processing techniques for the parts, and its own mix of material to manufacture the parts. It was not until well into 2004 that Gogoe became comfortable that Synergeering could reliably quote on more advanced programs for the production of intake manifolds. By the beginning of 2005, Synergeering was well positioned to manufacture and sell

both the prototype parts (Exhibit 26) and production parts (Exhibit 27) using a mixture of glass-filled nylon raw material and post-processing resins. Synergeering sold the prototype parts for anywhere from $8,000.00 to $12,000.00 and the production parts for approximately $80 per part. When Synergeering became fully operational in early 2005, there were no other companies in the United States that used this particular process to produce this kind of prototype parts. In mid-2005, Synergeering acquired a second EOS P700 to increase its capacity to manufacture the production parts.

The Debtor came to work for Synergeering just as its business was taking off in 2004. Prior to that time, the Debtor was not specifically involved in the laser sintering business. Instead, he had been in the design drafting and engineering business for many years and was previously employed as a design manager for a company that designed and manufactured prototype vehicles. Synergeering hired the Debtor as a selective laser sintering operations manager. His responsibilities were to run the EOS P700 machine and build parts. The Debtor interacted with Synergeering's customers and sought additional customers for Synergeering. Although the Debtor was knowledgeable about the pricing of Synergeering's products, the Debtor did not himself set the prices for Synergeering. During his employment at Synergeering, the Debtor was aware that Synergeering was the only company in the United States that had an EOS P700 laser sintering machine.

The Debtor worked for Synergeering until February, 2005. The Debtor had been injured on the job and missed some time. During the time that the Debtor was off work, Gogoe investigated the Debtor's educational background because he believed that the Debtor's performance was damaging parts manufactured by Synergeering. The Debtor's resume (Exhibit 6) indicated that he

had taken educational courses at several institutions in different programs, one of which was described as "B.S. Mechanical Engineering" at the University of Maryland. When Gogoe hired the Debtor, Gogoe assumed that this meant that the Debtor had a bachelor's degree from the University of Maryland in mechanical engineering. Gogoe learned that, in fact, the Debtor had not obtained a bachelor's degree from the University of Maryland in mechanical engineering. He had not even taken any classes at the University of Maryland, but had instead taken some classes off site that were later transferred to the University of Maryland. Gogoe confronted the Debtor about these facts. According to Gogoe, the Debtor then voluntarily left his employment at Synergeering. The Debtor however, maintains that he was terminated from his employment. In any event, the Debtor no longer worked at Synergeering after mid-February, 2005.

In March, 2005, the Debtor formed his own company, Jonatek, LLC ("Jonatek"). In May, 2005, a Synergeering salesperson ran into the Debtor at an annual trade show in the rapid prototyping industry. The Debtor told the salesperson that he was intending to open his own shop. In September, 2005, Jonatek leased an EOS P700 laser sintering machine, which was the same model of prototyping machine used by Synergeering. The Debtor knew that Synergeering was still the only company in the United States using the EOS P700 machine. In November, 2005, Jonatek began producing rapid prototype parts on its EOS P700 in competition with Synergeering. Jonatek's own program management report (Exhibit 18) identifies the quotes that Jonatek made for its customers beginning in November, 2005 and continuing until Jonatek went out of business in October, 2010. The program management report shows that right from the inception of its business, Jonatek was quoting projects for Synergeering's customers and was obtaining substantially all of its business from Synergeering's customers.

-4-

When Gogoe learned that Jonatek was competing with it, Synergeering filed a lawsuit in Wayne County Circuit Court on November 30, 2005 against the Debtor and Jonatek, case no. 05-534308-CK ("State Court Lawsuit"). The complaint (Exhibit 1) in the State Court Lawsuit alleged that the Debtor misappropriated sensitive and confidential information from Synergeering and improperly used it to compete with and harm Synergeering. Moreover, the complaint alleged that the Debtor engaged in this conduct "maliciously and with intent to injure Synergeering." The complaint sought various forms of monetary and injunctive relief under the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws Ann. §§ 445.1901 to .1910. The complaint also contained counts for tortious interference, unjust enrichment, and attorney fees.

Locked in litigation with Synergeering, and competing with it in the same business for the same customers, the Debtor embarked on a course of conduct that made his problem with Synergeering much worse. Synergeering had made a number of discovery requests in the State Court Lawsuit to the Debtor and Jonatek for access to information that they had stored on their computers. The Wayne County Circuit Court ordered the Debtor and Jonatek to make the requested items available. Initially, the Debtor denied the existence of some of those items, but then ultimately admitted that they existed. Synergeering filed a motion to compel production of the requested information and also requested that a default judgment be entered against the Debtor and Jonatek because of alleged spoliation of evidence. On November 9, 2006, the Wayne County Circuit Court conducted an evidentiary hearing on Synergeering's motion. On February 22, 2007, the Wayne County Circuit Court issued its Findings of Fact and Conclusions of Law Regarding Plaintiffs' Second Motion to Compel Discovery (Exhibit 2) ("State Court Opinion"). The Wayne County Circuit Court came down hard on the Debtor.

The State Court Opinion made the following findings of fact:

- the Debtor "willfully and intentionally" withheld discovery and "intentionally and willfully violated" the state court's orders by failing to produce discovery (finding of fact no. 1.f);

- the Debtor and Jonatek "destroyed, withheld, failed, or refused" to produce specifically identified computers, hard drives, and storage devices (finding of fact no. 4);

- the Debtor installed certain software "to permanently erase files so they cannot be detected or recreated through forensic analysis" (finding of fact no. 5);

- the Debtor "configured the . . . software so it would delete files from the following folders: recycle bin, run history, search history, and all temporary files" (finding of fact no. 5);

- the Debtor had manually operated the software on April 13, 2006 "for the purpose of permanently erasing files" from the Debtor's and Jonatek's computers before Synergeering's expert could conduct an inspection scheduled for the very same day (finding of fact no. 5);

- the Debtor created back-up copies of information for his own use that he then "withheld and refused to produce" for Synergeering's inspection (finding of fact no. 6);

- the Debtor placed certain storage devices "in the custody of his brother during the [State Court Lawsuit] with full knowledge" of his responsibility to preserve evidence (finding of fact no. 7);

- the Debtor "deleted the contents" of his laptop folder and "attempted to destroy evidence on the HP Pavilion by deleting files" (finding of fact no. 8);

- the Debtor's "actions were either a deliberate attempt to destroy" records or were the result of "reckless disregard" of the Debtor's obligations to preserve evidence (finding of fact no. 9);

- the Debtor "intentionally and willfully violated" orders entered in the State Court Lawsuit "by withholding computers, storage devices, and backup files" (finding of fact no. 11); and

- the data erased and withheld by the Debtor "cannot be replicated and covers the time periods where the Plaintiffs[ ] assert the Debtor was

misappropriating the Plaintiff's proprietary information" (finding of fact no. 12).

In conclusion of law no. 3, the State Court Opinion considered what would be an appropriate remedy for the spoliation of evidence, violation of discovery orders and other misconduct by the Debtor in the State Court Lawsuit:

> The lesser sanction of an adverse inference is not warranted because Defendants have engaged in a willful, deliberate, and repeated pattern of obfuscation and mendacity. Defendants violated this Court's March 23, 2006 order by withholding or destroying computers, storage devices, and files. Defendants repeated their misconduct by withholding and destroying computers, storage devices, and files prior to Plaintiffs' second inspection on October 20, 2006. Defendants also attempted to cover up their spoliation of evidence by committing perjury during Defendant Jonatzke's deposition and during the evidentiary hearing before this Court on November 9, 2006 when Defendants denied having any knowledge of the withheld or destroyed evidence.

The State Court Opinion then entered a default against the Debtor and Jonatek, and precluded them from opposing Synergeering's MUTSA claim. The Wayne County Circuit Court explained its decision in conclusion of law no. 5 as follows:

> Entry of a default precluding Defendants from opposing the Michigan Uniform Trade Secret Act claim is warranted because all of the computers and alleged missing devices or files were under Defendants' control and could have been produced during discovery. Defendants do not have any reasonable excuse for intentionally destroying computer files and withholding the computers, files and devices noted above. Moreover, Defendants' intentional spoliation of evidence has directly affected Plaintiffs' ability to prove its case because Plaintiffs have been denied the opportunity to conduct full and fair discovery regarding Defendants' business activities from February 2005 to present.

After issuing the State Court Opinion, the Wayne County Circuit Court scheduled a trial in the State Court Lawsuit solely to determine Synergeering's damages arising from the Debtor's and Jonatek's violation of MUTSA. The Wayne County Circuit Court also imposed a discovery sanction upon the Debtor and Jonatek in the amount of $48,539.72.

-7-

On the eve of the trial in the State Court Lawsuit, Synergeering, the Debtor and Jonatek entered into a Mutual Release and Settlement Agreement on November 21, 2007 (Exhibit 3) ("Settlement Agreement"). The Settlement Agreement restricted the Debtor and Jonatek from directly or indirectly soliciting sales from certain identified customers for three and one-half years. In addition, the Settlement Agreement called for the Debtor and Jonatek to pay a total of $660,000.00 to Synergeering over five and one-half years in installment payments of $60,000.00 to be made on January 1 and July 1 of each year. The Settlement Agreement also provided for the entry of a "consent judgment" in the amount of $3,000,000.00 in favor of Synergeering and against the Debtor and Jonatek in the event that a court of competent jurisdiction "confirms" that the Debtor and Jonatek breached the Settlement Agreement.

Unfortunately, the Settlement Agreement did not end the litigation between Synergeering and the Debtor. Although the Debtor and Jonatek paid between $300,000.00 to $360,000.00[1] to Synergeering under this Settlement Agreement, Synergeering alleged that the Debtor and Jonatek breached the Settlement Agreement by a subterfuge whereby they had Jonatek book sales to straw customers who were not off limits under the Settlement Agreement, but then shipped the parts directly to customers who were off limits under the Settlement Agreement. Synergeering also alleged other breaches of the Settlement Agreement by the Debtor and Jonatek.

On August 25, 2010, the Wayne County Circuit Court issued an Opinion and Order Entering Consent Judgment (Exhibit 4) ("Second State Court Opinion") finding that the Debtor and Jonatek breached the Settlement Agreement and concluding that Synergeering was entitled to the entry of

---

[1] The record is unclear. There was unrefuted testimony at trial by the Debtor that he paid $300,000.00 or $360,000.00 to Synergeering under the Settlement Agreement. But he was not sure of the correct amount.

a $3,000,000.00 "consent judgment" against the Debtor and Jonatek. On September 24, 2010, the Wayne County Circuit Court entered a judgment ("Judgment") in favor of Synergeering and against the Debtor and Jonatek in the amount of $3,000,000.00. In October, 2010, in the face of Synergeering's supplementary proceedings to enforce the Judgment, Jonatek ceased operations.

On November 3, 2010, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On January 24, 2011, Synergeering filed this adversary proceeding. Synergeering's complaint contains three counts: Count I is brought under § 523(a)(2)(A) of the Bankruptcy Code; Count II under § 523(a)(4); and Count III under § 523(a)(6). Each count seeks a determination of a non-dischargeable debt in the amount of $3,000,000.00 "plus additional damages attributed to [the Debtor]'s actions after the execution of the Settlement Agreement."

On August 11, 2011, Synergeering moved for summary judgment with respect to its § 523(a)(6) count only. Synergeering argued that the Debtor's MUTSA violations constitute a willful and malicious injury under § 523(a)(6) of the Bankruptcy Code. The Debtor argued that the State Court Opinion did not contain findings that the Debtor's MUTSA violations themselves were willful and malicious. The Court agreed with the Debtor, denied Synergeering's motion for summary judgment and instructed the parties to prepare a joint final pretrial order and proceed to trial.

On October 24, 2011, the Court held the final pretrial conference. Counsel for Synergeering and the Debtor informed the Court that they believed that the trial of this adversary proceeding could be more efficiently conducted, and the issues narrowed, if they were permitted to first seek a pretrial ruling from the Court with respect to three separate issues. Synergeering and the Debtor then requested an adjournment of the trial to permit them to frame the three issues in writing, brief those

issues, and have the Court rule upon them. The Court granted their request, instructed them to file a written stipulation setting forth the three issues, and set a schedule for their briefing. On October 28, 2011, Synergeering and the Debtor filed a stipulation (docket entry no. 32) setting forth the three "contested issues." The first issue pertained to the effect of the State Court Opinion in this adversary proceeding. The second issue pertained to whether the Judgment is dispositive of Synergeering's damages under § 523(a)(6). The third issue pertained to the effect in this adversary proceeding of a separate pretrial ruling made by the Wayne County Circuit Court that is not relevant here.

After the three contested issues were briefed by the parties, the Court heard arguments on them and issued a ruling on December 21, 2011 (docket entry no. 48). On the first and second contested issues, the Court entered an order that set forth its rulings as follows:

> The first contested issue identified by the parties pertains to the effect of the Defendant's conduct in the State Court Lawsuit regarding the destruction of evidence in the State Court Lawsuit. The Court ruled in favor of the Plaintiff on this issue. Principles of collateral estoppel apply in this adversary proceeding to the Findings of Fact and Conclusions of Law Regarding Plaintiffs' Second Motion to Compel Discovery ("State Court Findings and Conclusions") that was issued by the Wayne County Circuit Court in the State Court Lawsuit on February 22, 2007. The State Court Findings and Conclusions demonstrate a willful and malicious injury by the Defendant to the Plaintiff[2] and satisfy all of the elements under § 523(a)(6) of the Bankruptcy Code. This Court is bound by the State Court Findings and Conclusions. The Plaintiff need not introduce any evidence at the trial of this adversary proceeding under § 523(a)(6) of the Bankruptcy Code to demonstrate a willful and malicious injury by the Defendant to the Plaintiff because of the preclusive effect of the State Court Findings and Conclusions.

---

[2] To be more precise, the order should have stated that the State Court Findings and Conclusions demonstrate a willful and malicious injury by the Debtor to the property of Synergeering, instead of to Synergeering itself. This is because the Debtor's actions injured Synergeering's cause of action against the Debtor and Jonatek, which is a property interest of Synergeering.

The second contested issue identified by the parties pertains to whether the consent judgment in the amount of $3,000,000.00 entered by the Wayne County Circuit Court in the State Court Lawsuit is entitled to preclusive effect on the question of the Plaintiff's damages in this § 523(a)(6) adversary proceeding. The Court held that the $3,000,000.00 consent judgment is not entitled to preclusive effect with respect to the amount of the debt to be excepted from discharge under § 523(a)(6) of the Bankruptcy Code. At the trial of this adversary proceeding, the Court will determine the amount of the debt to be excepted from discharge under § 523(a)(6) of the Bankruptcy Code based upon the evidence adduced at the trial.

The Court then scheduled a new trial date. On February 21, 2012, the Court entered a joint final pretrial order (docket entry no. 56) upon the stipulation of Synergeering and the Debtor. On February 24, 2012, the Debtor filed a motion in limine (docket entry no. 60) requesting an order excluding the testimony of Eric M. Fudo, an expert witness on damages named by Synergeering in the joint final pretrial order. The Court scheduled a hearing on the motion in limine for the same day as the trial. On March 14, 2012, the Court heard the motion in limine and held the trial. Synergeering called three witnesses at the trial: the Debtor, Gogoe and Fudo. The Debtor called two witnesses: himself and Gogoe. The Court received into evidence Synergeering's Exhibits 1 through 27 and the Debtor's Exhibit A. Closing arguments were held on March 29, 2012. The Court took both the trial and the motion in limine under advisement.

## Analysis of § 523(a)(6) elements

Although Synergeering's complaint seeks relief under § 523(a)(2)(A), (4) and (6) of the Bankruptcy Code, the joint final pretrial order only addresses the § 523(a)(6) count. Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of the debtor." To be "willful" for purposes of § 523(a)(6), a debtor must *intend the injury*. Simply intending an act that causes injury is insufficient. Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998). The U.S. Court of Appeals for the Sixth Circuit has held that

"willfulness" also means that "'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it . . . .'" Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)). "Malicious" means "done intentionally, without just cause or excuse." Tinker v. Colwell, 193 U.S. 473, 485-86 (1904) (interpreting analogous § 17(a)(2) of the former Bankruptcy Act) (internal quotation marks and citation omitted); see also In re Markowitz, 190 F.3d at 465 n.10 (finding that a "lack of an excuse or justification for [a debtor's] actions will not alone make [a] debt non-dischargeable under § 523(a)(6)"). "In order to except a debt from discharge, a creditor must prove each of [the] elements [of non-dischargeability] by a preponderance of the evidence." Rembert v. AT & T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)). "Further, exceptions to discharge are to be strictly construed against the creditor[,]" id. (citation omitted), and "are to be strictly construed in favor of the debtor," United States v. Hindenlang (In re Hindenlang), 164 F.3d 1029, 1034 (6th Cir. 1999) (citation omitted).

The Court has already held that the State Court Opinion satisfies all of the elements under § 523(a)(6). Both Synergeering and the Debtor state in the joint final pretrial order that the only fact issue to be tried is the amount of damages suffered by Synergeering as a result of the Debtor's willful and malicious injury . Before turning to the evidence adduced by the parties on the issue of damages, it is worth explaining how the Court applied the principles of collateral estoppel to the elements of § 523(a)(6) in this case.

Principles of collateral estoppel apply to determinations of non-dischargeability of debt in bankruptcy cases. Spilman v. Harley, 656 F.2d 224, 227 (6th Cir. 1981). Because the State Court

Opinion was issued by a state court in Michigan, this Court must look to Michigan law to determine what preclusive effect Michigan courts would give to the State Court Opinion. Rally Hill Productions, Inc. v. Bursack (In re Bursack), 65 F.3d 51, 53 (6th Cir. 1995) (citing Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984)). The Court of Appeals for the Sixth Circuit has summarized Michigan law on collateral estoppel as follows:

> Under Michigan law, collateral estoppel applies when "1) there is identity of parties across the proceedings, 2) there is a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the parties against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding."

Hinchman v. Moore, 312 F.3d 198, 202 (6th Cir. 2002) (quoting Darrah v. City of Oak Park, 255 F.3d 301, 311 (6th Cir. 2001) (citing People v. Gates, 452 N.W.2d 627, 630-31 (Mich. 1990))).

In this case, all four requirements of collateral estoppel are met with respect to the State Court Opinion. First, Synergeering and the Debtor are the identical parties to the State Court Lawsuit. Second, the Judgment is a valid, final judgment against the Debtor.[3] Third, a review of the State Court Opinion shows that the question of the Debtor's willfullness and maliciousness in the spoliation of evidence was both actually litigated and necessarily determined in the State Court Opinion. The Debtor was found to have intended to injure Synergeering and its property by deliberately destroying the evidence that Synergeering needed to prove its case. The Debtor was found to have no reasonable excuse for intentionally destroying the evidence. Fourth, the State

---

[3] Although the Second State Court Opinion was not issued until August 25, 2010, and the Judgment was not entered until September 24, 2010, the Debtor has not argued that the State Court Opinion is somehow not a valid, final order. The Debtor's brief (docket entry no. 25) in response to Synergeering's motion for summary judgment disputes the application of collateral estoppel principles, but does not dispute that the State Court Opinion was entered in the State Court Lawsuit and that the Judgment in that case constitutes a valid, final order of the Wayne County Circuit Court.

-13-

Court Opinion was rendered after a full evidentiary hearing, and no contention has been made that the Debtor did not have a full and fair opportunity to litigate the issues of his willfulness and maliciousness in the spoliation of evidence in the State Court Lawsuit. With all four of the requirements of collateral estoppel present, the findings of fact contained in the State Court Opinion are binding upon this Court. All of the elements of a non-dischargeable debt under § 523(a)(6) of the Bankruptcy Code are satisfied by the State Court Opinion which is binding upon this Court. The only issue left open for trial in this Court under § 523(a)(6) is the *amount* of the non-dischargeable debt that resulted from the Debtor's willful and malicious injury.

### **What is Synergeering's loss?**

Synergeering and the Debtor disagree on the loss that was caused by the Debtor's willful and malicious injury. Synergeering contends that its loss and, therefore, the debt that is non-dischargeable in this case, is the amount of the damages sustained by Synergeering because of the Debtor's MUTSA violations. Synergeering argues that the reason why those damages constitute the amount of its loss is because that is what Synergeering was deprived of proving in the State Court Lawsuit. On the other hand, the Debtor contends that even if he did cause damages to Synergeering by his MUTSA violations, the willful and malicious conduct described in the State Court Opinion occurred long after that debt arose. Because the Debtor's destruction of evidence is the willful and malicious conduct found by the State Court Opinion, and because that willful malicious conduct only occurred during the litigation *after* the debt for the MUTSA violations arose, the Debtor reasons that the debt arising from his MUTSA violations could not possibly have been caused by the his willful and malicious conduct. The Debtor argues that the only loss suffered by Synergeering because of his willful and malicious injury (i.e., the destruction of evidence), was the $48,539.72

-14-

attorney fee awarded in the State Court Opinion. According to the Debtor, this disconnect is fatal to Synergeering's request to have the damages caused by his MUTSA violations determined to be a non-dischargeable debt.

To understand these contrasting positions, the place to begin is the Court's denial of Synergeering's earlier motion for summary judgment. In that motion, Synergeering focused on the Debtor's conduct that violated MUTSA. Synergeering asked the Court to apply collateral estoppel principles to hold that the Debtor's conduct in violating MUTSA was a willful and malicious injury. The Court denied the motion, finding that the requirements of collateral estoppel, at least as they were argued in that motion, were not met. Specifically, the Court found that the Wayne County Circuit Court had not ruled on the merits of Synergeering's allegations that the Debtor had willfully and maliciously violated MUTSA, nor were such findings essential to the State Court Opinion or the Judgment. The Debtor construes the Court's denial of Synergeering's motion for summary judgment as somehow meaning that Synergeering cannot prevail in obtaining a non-dischargeable judgment for the Debtor's MUTSA violations because Synergeering did not ever prove in the State Court Lawsuit that the Debtor's MUTSA violations were willful and malicious. In other words, because Synergeering did not obtain a specific finding in the State Court Lawsuit that the Debtor's MUTSA violations were willful and malicious, the Debtor argues that it is futile for Synergeering to invoke collateral estoppel principles to prove a non-dischargeable debt under § 523(a)(6) of the Bankruptcy Code.

Ordinarily, the Debtor's arguments might have merit. Without a specific finding in the State Court Lawsuit that the Debtor's MUTSA violations were willful and malicious, it would usually not be possible for Synergeering to rely upon principles of collateral estoppel to establish its § 523(a)(6)

-15-

debt. But this case is different. There is a reason why Synergeering did not obtain a specific finding in the State Court Lawsuit that the Debtor's MUTSA violations were willful and malicious. The Debtor does not mention the reason, but the reason is obvious. Synergeering could not obtain a specific finding in the State Court Lawsuit that the Debtor acted willfully and maliciously in violating MUTSA *because the Debtor destroyed the evidence necessary to prove that allegation.* The Debtor defeated Synergeering's motion for summary judgment because that motion only requested the Court to apply collateral estoppel principles to any specific findings made by the Wayne County Circuit Court concerning the Debtor's MUTSA violations. Since the State Court Opinion made no specific findings of willfulness and maliciousness with respect to those MUTSA violations, the Court denied Synergeering's motion for summary judgment on the grounds stated in the motion.

After the Court denied Synergeering's motion for summary judgment, Synergeering and the Debtor, as explained above, later requested the Court to make additional pretrial rulings regarding certain "contested issues." This time, Synergeering took a different approach and asked the Court to make a ruling with respect to the State Court Opinion's findings of willful and malicious conduct focusing on the Debtor's destruction of evidence. The Court agreed with Synergeering. The Court held that collateral estoppel principles *do apply* to the findings made in the State Court Opinion regarding the Debtor's willful and malicious conduct in destroying evidence in the State Court Lawsuit. Just as Synergeering's arguments evolved, so too did the Debtor's. Once the Court ruled that the State Court Opinion's findings about the Debtor's destruction of evidence were sufficient by themselves to prove a willful and malicious injury under § 523(a)(6) of the Bankruptcy Code, the Debtor shifted gears and asserted that this willful and malicious injury may have prevented

-16-

Synergeering from proving its case, but it did not create any new debt. In support, the Debtor cites a number of cases holding that subsequent bad conduct on the part of a debtor to thwart a collection effort by a creditor does not retroactively change the nature of the debt and convert the debt into a non-dischargeable debt if the debt is otherwise dischargeable. The Debtor's arguments have some superficial appeal, but they break down upon closer examination.

The central flaw in the Debtor's reasoning is his assumption that Synergeering's loss consists of the attorney fees that Synergeering was forced to incur because of the Debtor's destruction of evidence. Wrong. Synergeering's loss (and, therefore, the Debtor's debt) instead consists of its inability to prove the allegations that it made in the State Court Lawsuit that the Debtor violated MUTSA "maliciously and with an intent to injure Synergeering." That is what the Debtor deprived Synergeering from proving when he chose to intentionally and maliciously destroy evidence in the State Court Lawsuit. The State Court Opinion found that the Debtor's deliberate destruction of evidence directly prevented Synergeering from proving the claims that it made in its complaint under MUTSA. One of those claims was expressly stated in paragraph 37 of the complaint: that the Debtor's misappropriation of trade secrets from Synergeering in violation of MUTSA was done "maliciously and with intent to injure Synergeering." Synergeering's real injury was the loss of the opportunity and the ability to prove this allegation and demonstrate that the damages it suffered were caused not just by the Debtor's MUTSA violations, but instead were caused by the fact that the Debtor violated MUTSA "maliciously and with intent to injure Synergeering." That loss was directly and proximately caused by the Debtor's spoliation of evidence, in other words, by the Debtor's willful and malicious injury. Synergeering still has to prove the *amount* of the damages that it suffered when it lost the opportunity to prove its case in the State Court Lawsuit. But the

-17-

Court rejects the Debtor's analysis of what makes up the *loss* suffered by Synergeering as a result of the willful and malicious injury that occurred when the Debtor destroyed evidence in the State Court Lawsuit.[4] The Court declines to adopt the Debtor's reasoning, and his invitation to now reward him for deliberately destroying evidence in the State Court Lawsuit, covering it up, and then perjuring himself to avoid having to try Synergeering's claims against him in the State Court Lawsuit.

### What is the measure of damages for Synergeering's loss?

Synergeering's complaint requests that the Court find that the entire $3,000,000.00 Judgment, "plus additional damages," is non-dischargeable under § 523(a)(6). At trial, Synergeering increased this request to $4,764,639.00. The Court has already rejected Synergeering's argument that the Judgment is binding on this Court for purposes of determining the amount of Synergeering's debt that is non-dischargeable under § 523(a)(6).[5] The determination of the amount of Synergeering's non-dischargeable debt under § 523(a)(6) turns instead upon first understanding what damages Synergeering could have recovered under Michigan law if it had been permitted to prove in the State Court Lawsuit that the Debtor's MUTSA violations were done "maliciously and

---

[4] The cases cited by the Debtor in support of his argument are distinguishable. The debt in those cases arose before the willful and malicious conduct. Later bad conduct on the part of the debtors to thwart collection efforts did not retroactively change the nature of debt. See Steier v. Best (In re Best), No. 03-5098, 109 Fed. Appx. 1, 6-7 (6th Cir. June 30, 2004); National Auto Finance Co. v. Smith (In re Smith), 249 B.R. 748, 750 (Bankr. S.D. Ohio 2000). That is not the case here, where the debt arose from and was proximately caused by the Debtor's willful and malicious conduct in destroying evidence.

[5] The reason why the Court rejected this argument is because the Second State Court Opinion directed the entry of the Judgment because of the Debtor's and Jonatek's breach of the Settlement Agreement, not because of the Debtor's destruction of evidence nor because of the Debtor's MUTSA violations.

-18-

with intent to injure Synergeering," and then reviewing the evidence in the trial record before this Court to ascertain what Synergeering would have recovered as actual damages.

Mich. Comp. Laws Ann. § 445.1904 provides for the recovery of damages for misappropriation of trade secrets under MUTSA as follows:

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Although the statute provides for more than one measure of damages, Synergeering is seeking, and introduced evidence in support of, damages consisting only of the actual losses it suffered.

Case law in Michigan provides guidance in how to calculate the damages recoverable as actual damages under this statutory provision. "The general rule is that plaintiff may recover all damages resulting necessarily, immediately and directly from defendant's breach but may not recover such damages as are contingent, speculative or uncertain." Hayes-Albion v. Kuberski, 311 N.W.2d 122, 127 (Mich. Ct. App. 1981), aff'd in part and rev'd in part on other grounds, 364 N.W.2d 609 (Mich. 1984) (trade secret case decided under common law before the enactment of MUTSA). "Certainty is doubtless very desirable in estimating damages in all cases; and where, from the nature and circumstances of the case, a rule can be discovered by which adequate compensation can be accurately measured, the rule should be applied in actions of tort, as well as those upon contract." Allison v. Chandler, 11 Mich. 542, 554-55 (1863). In some cases, "'the certainty requirement will be relaxed where the fact of damage has been established and the question

-19-

to be decided is the extent of the damage.'" <u>Hayes-Albion v. Kuberski</u>, 311 N.W.2d at 128 (quoting <u>Howard v. City of Melvindale</u>, 183 N.W.2d 341, 345-46 (Mich. Ct. App. 1970)).

In the State Court Opinion, the Wayne County Circuit Court entered a default against the Debtor as a sanction for the Debtor's destruction of evidence that left Synergeering unable to prove its case. As explained earlier in this opinion, Synergeering lost access to the evidence to prove that the Debtor's misappropriation was willful and malicious when the Debtor destroyed that evidence and the evidence was incapable of being replicated. The Debtor's destruction of evidence inflicted a willful and malicious injury upon Synergeering that caused a loss to Synergeering of its right to recover actual damages under MUTSA. The *measure* of damages for Synergeering is what it was entitled to recover, but deprived of recovering, under MUTSA § 445.1904.

### The evidence that Synergeering suffered actual damages

Synergeering introduced evidence that it was a profitable company, which then saw its profits decline precipitously. Gogoe testified that Synergeering's business was just taking off at about the time that the Debtor became employed by Synergeering. Monthly profit and loss statements for Synergeering (included in Exhibit 22) show "total income" for 2003 of $479,659.00; 2004 of $1,089,332.00; 2005 of $1,488,281.00; and 2006 of $1,913,973.00. Synergeering's tax returns for the years 2007 through 2010 (Exhibit A) show gross revenues for 2007 of $1,960,299.00; 2008 of $1,727,396.00; 2009 of $1,670,054.00; and 2010 of $2,029,699.00. Gogoe testified that during 2004 and 2005, there were no other companies in the United States that could produce parts of the kind and quality of Synergeering's parts. Gogoe further testified that when the Debtor began competing through Jonatek in late 2005 and 2006, there were now two companies ten miles apart, Synergeering and Jonatek, that could produce these parts. Although Gogoe conceded that

-20-

Synergeering did not have a "monopoly" on these parts, he testified that there were no other companies competing with respect to Synergeering's "niche product" until Jonatek appeared on the scene. Gogoe testified that the Debtor's competition both for Synergeering's existing customers and for new customers directly harmed Synergeering's business.

Gogoe next testified that there were several types of damages to Synergeering caused by the Debtor's misappropriation of trade secrets. First, Gogoe testified that Synergeering lost business directly from its existing customers. Gogoe explained that once Jonatek entered the market as a competitor, Synergeering's "hit rate" on its quotes to its customers diminished. Second, Gogoe testified that Jonatek's presence as a competitor in the market resulted in the erosion of Synergeering's pricing for its products. Third, Gogoe testified that there were substantial out-of-pocket expenditures for legal fees, marketing, advertising and other expenses incurred by Synergeering as a result of the Debtor's misappropriation of trade secrets and violations of MUTSA.

Synergeering introduced several exhibits in support of Gogoe's testimony to establish the fact that Synergeering suffered damages. One of those exhibits was Jonatek's own project management report (Exhibit 18). That report demonstrates that substantially all of Jonatek's business after it began production in November, 2005 came from quotes that it made to, and jobs that it received from, Synergeering's customers. Also Jonatek's tax returns (Exhibit 8) show that in its first full year, 2006, it had gross revenues of $503,037.00, that its revenues increased to $951,879.00 in 2007, continued at $945,692.00 in 2008, and then fell to $303,980.00 in 2009 before it ceased business in 2010. Synergeering did not introduce any exhibits to support the price erosion described by Gogoe, but did introduce documents (Exhibits 11 - 17) to show that it incurred attorney fees and other out-of-pocket expenses.

-21-

The Debtor did not introduce any evidence to prove that Synergeering did not suffer damages, except for his own opinion testimony. The Debtor testified that he believed that Synergeering had "at least a dozen" competitors capable of making and selling the same parts made and sold by Synergeering during the time he worked there, and "dozens" while Jonatek was operating. However, the Debtor did not offer any other testimony or documentary evidence to corroborate his beliefs.

Gogoe's unrefuted testimony and exhibits, combined with Jonatek's project management report and tax returns, demonstrate that Synergeering was in fact damaged by the Debtor's MUTSA violations found by default by the Wayne County Circuit Court. The Debtor misappropriated Synergeering's trade secrets and succeeded in using them to compete with Synergeering and wrongfully generate revenues from Synergeering's customers. The willful and malicious injury inflicted by the Debtor upon Synergeering by destroying evidence and testifying falsely in the Wayne County Circuit Court prevented Synergeering from proving in the State Court Lawsuit that these damages resulted from the Debtor violating MUTSA "maliciously and with intent to injure Synergeering." The Court is persuaded that Synergeering has met its burden to prove the *fact* of damages, (i.e., that it suffered actual damages), and further finds that the Debtor has failed to come forward with evidence to show that Synergeering did not suffer actual damages. The tougher issue is quantifying the amount of Synergeering's actual damages.

### Quantifying the amount of Synergeering's damages

There are four components to Synergeering's alleged actual damages: (1) lost profits during the years 2005 through 2007; (2) erosion in market prices experienced by Synergeering during the years 2005 through 2007; (3) a combination of lost profits from loss of sales volume and price

-22-

erosion for the years 2008 through 2012; and (4) out-of-pocket expenses incurred by Synergeering related to legal fees, advertising and marketing.

At trial, Synergeering primarily relied on the testimony of Fudo as an expert witness to quantify the amount of its damages. Fudo is a director of BBP Partners, LLC, a consulting firm that performs a variety of accounting and financial services. Fudo spends about 60% of his time in performing damage analytics, lost profit analytics and expert witness services in litigation. Fudo was retained by Synergeering after the State Court Opinion to help Synergeering quantify the damages Synergeering sustained by reason of the Debtor's theft of trade secrets from Synergeering.

Fudo prepared a report dated April 12, 2007 (part of Exhibit 7) that estimated Synergeering's damages through March 31, 2007 arising from the Debtor's MUTSA violations. Fudo updated his report three times (also part of Exhibit 7), the last just before the trial of this adversary proceeding. Fudo testified that he reviewed Synergeering's general ledger and production and cost information, as well as some production information from Jonatek. Fudo also acknowledged that Gogoe provided him with most of the information that he relied upon. Fudo and Gogoe met frequently to discuss Synergeering's business generally and its industry overall. Based upon the information provided to him by Gogoe, Fudo prepared a calculation estimating Synergeering's damages based upon a "but for" method. Fudo explained that this meant that he "compared the actual results achieved by Synergeering with the results that would have been achieved by Synergeering but for the fact of -- of trade secrets." (Trial Transcript ("Transcript") at 117 (docket entry no. 67).) Fudo testified that in his opinion, Synergeering was damaged by the Debtor's MUTSA violations in the total amount of $4,764,639.00. (Transcript at 132.)

As noted above, the Debtor filed a motion in limine to exclude Fudo's testimony. The Debtor's motion does not challenge Fudo's qualifications as an expert. Instead, the Debtor's motion argues that Fudo's testimony is not admissible because the assumptions made by Fudo in formulating his expert opinion are not based upon facts in the record in this adversary proceeding but, instead, are based upon speculation and assumptions that Gogoe requested Fudo to make without any factual basis to support them. In response to the Debtor's motion, Synergeering argues that because the adversary proceeding is a bench trial, the Court need not exclude Fudo's testimony under the Supreme Court's analysis in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Instead, Synergeering asserts that the Court should admit Fudo's expert testimony and then, to the extent that any of Fudo's assumptions are shown to be unsupported by the evidence, consider any weaknesses in the factual bases of Fudo's expert opinion when determining the weight to be given to his opinion.

Fed. R. Evid. 702 governs testimony by experts. The testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods[.]" Fed. R. Evid. 702(b) - (c).[6] The expert then must "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

The Debtor's motion also implicates Fed. R. Evid. 703, which addresses the bases of an expert's opinion testimony. That rule provides in part as follows:

---

[6] Federal Rule of Evidence 702 was amended, effective December 1, 2011. Synergeering's motion in limine was filed, and trial in this case held, after the effective date of the revised rule. Although the Court is using the amended version of Rule 702, <u>see</u> <u>Toth v. Grand Trunk R.R.</u>, 306 F.3d 335, 343 n.2 (6th Cir. 2002) ("Generally a new procedural rule applies to the uncompleted portions of suits pending when the rule became effective[.]"), the amendments made only stylistic changes and the result would be the same under either version.

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703.[7]

"The task for the [trial] court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529-30 (6th Cir. 2008). "'The inquiry [under Rule 702] is . . . a flexible one . . . . The focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'" In re Creekside Senior Apartments, LP, __ B.R. __, No. 11-8072, 2012 WL 2479549, at *21 (B.A.P. 6th Cir. June 29, 2012) (quoting Daubert, 509 U.S. at 595). "When a party agrees that an expert witness used an accepted methodology, but that the data used in applying that methodology was flawed, such an allegation does not require a court to exclude the testimony or report." Id. at *22 (citation omitted). "Instead, 'such an attack goes to the weight of the evidence, rather than to its admissibility.'" Id. (quoting Scrap Metal Antitrust Litig., 527 F.3d at 530). "'[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence . . . .'" United States v. Jones, 107 F.3d 1147, 1151 (6th Cir. 1997) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35 (1962)). "This discretion is particularly broad in a bench trial." United States v. Demjanjuk, 367 F.3d 623, 633 (6th Cir. 2004) (citation omitted).

To some extent, the Debtor and Synergeering are both right. The Court is convinced that Fudo is an expert in the field of damage analytics and lost profit analytics. However, that does not

---

[7] The December 1, 2011 amendments also made stylistic changes to Federal Rule of Evidence 703.

mean that the Court must accept all of Fudo's testimony. The foundation for Fudo's testimony varied considerably among the different components of Synergeering's alleged damages. In some instances, Fudo relied on facts and data before applying his methods to reach his conclusions. In other instances, he relied on unsupported assumptions learned only from Gogoe that are neither supported by evidence in the record nor shown to be the types of facts and data that are reasonably relied upon by experts in Fudo's field. That does not mean that Fudo's opinion should be excluded entirely from the evidence, but it does mean that the Court must separately review the evidence in the record regarding Fudo's testimony concerning each component of Synergeering's alleged damages.

### (1) Expert testimony regarding lost profits during the years 2005 through 2007

The first component of damages estimated by Fudo consists of lost profits for Synergeering from November, 2005 through December, 2007. Fudo estimated this amount to be $1,250,652.00. Fudo arrived at that figure by first looking at Jonatek's sales, converting its pricing to Synergeering's method of pricing, then quantifying the lost sales for Synergeering that went to Jonatek, less the costs that would have been incurred by Synergeering in making those sales. Fudo calculated Synergeering's lost profits for this period of time to be $1,403,744.00. Fudo then discounted this amount by a 20% rate. Fudo explained that this discount rate was selected to reflect that "there is some degree of speculation," Synergeering's "revenues over this period of time would be somewhat volatile because of its size," and because "there is some uncertainty as to -- whether or not Synergeering would have been able to achieve these sales." (Transcript at 124.) After applying this discount rate, Fudo then added back in a statutory interest component through

-26-

December 31, 2007 to account for his belief that "either a judgment would have been entered, or payment would have been received" by that date. (Transcript at 123.)

The Debtor did not introduce any evidence to refute Fudo's estimate of Synergeering's lost profits for 2005 through 2007. However, the cross examination of Fudo left the Court with the impression that Fudo simply accepted without scrutiny all of the assumptions provided to him by Gogoe and then performed a calculation. On cross examination, Fudo acknowledged that his opinion on this first component was premised on the "assumption" that if Jonatek did not exist, then Synergeering would have obtained all of the work that Jonatek got. Fudo testified that he made the assumption that all of Jonatek's sales would have gone to Synergeering because that is what Gogoe told him. (Transcript at 136.) Fudo explained that, "I have to trust Mr. Gogoe in his -- his statements and the assumptions that I rely on because of those statements." (Transcript at 137.) Fudo's opinion on lost sales volume is essentially a zero sum analysis tied entirely to the premises provided to him by Gogoe. In other words, every sale that Jonatek received was one less sale that Synergeering received, based only on Gogoe's say so. Fudo admitted that he did not make any independent inquiry of any of Jonatek's customers to ascertain whether they would have made the same purchases from Synergeering, nor did he receive any documentation from any of those customers, nor did he even see documents prepared by Gogoe regarding the customers alleged to have been stolen by the Debtor. Fudo also admitted that he did not do any independent research to determine if there were any other competitors of Synergeering, but instead stated, "Again, I relied on the assumption that Mr. Gogoe operated in a niche market in which he had a monopoly but for Mr. Jonatzke's involvement." (Transcript at 143.) When asked whether he received any data regarding the presence or absence of competitors in this business, Fudo testified that he did not

receive any data, even from Gogoe, but instead made his assumption "based on conversations more than data." (Transcript at 144.) Although there is conflicting testimony between Gogoe and the Debtor over whether EOS, the manufacturer of the laser sintering machine P700, had sold any other machines of this kind throughout the country to manufacture the same type of prototypes, Fudo did no investigation on this issue at all. In sum, Fudo accepted at face value Synergeering's contention that there were no other EOS P700 machines; there were no other competitors; all of the work that went to Jonatek would have gone to Synergeering; and any loss in revenue experienced by Synergeering must have been the result of Jonatek.

After considering the facts and data used by Fudo, and the methodology he applied in reaching his conclusion regarding Synergeering's lost profits, the Court accepts Fudo's estimate of lost profits for Synergeering but only for the period of November, 2005 through December 31, 2006. Apart from the assumptions given to Fudo by Gogoe, Fudo's estimate of lost profits for this time frame does appear to be based upon other facts in the record. First, this period of time is close in proximity to the date of the MUTSA violations found by the Wayne County Circuit Court. Second, Jonatek's tax returns (Exhibit 8) reflect that 2006 was the first year of explosive growth in revenues for Jonatek. Third, Jonatek's own project management report shows that Jonatek's sales during the last part of 2005 and all of 2006 were substantially all made to customers of Synergeering (Exhibit 18). Fourth, the Debtor admitted that there were no other United States based automotive suppliers using the EOS P700 machines in competition with Synergeering in 2005. (Transcript at 5.) Fifth, Fudo testified on direct examination that, "for the most part," he used past activity to prepare his estimates of lost profits when he was first hired in early 2007 (Transcript at 117) in

contrast to his estimate of lost profits for 2007.[8] These facts taken together provide a sufficient foundation for Fudo's estimate of Synergeering's lost profits through 2006.

However, the Court does not find Fudo's estimate of lost profits for 2007 to be adequately supported by a reliable foundation. While the evidence demonstrates that there were no other EOS P700 machines being used by automotive suppliers in competition with Synergeering in 2005 and 2006, the evidence shows that this situation changed in 2007. Gogoe admitted on cross examination that he learned by October, 2006 that there were other EOS P700 machines being used in North America. (Transcript at 76.) On further questioning, Gogoe also admitted that, as time went on, more competitors entered Synergeering's niche market, including some in this area that bid on some of the same projects that Synergeering did, although Gogoe's testimony was not clear as to when in 2007 these competitors appeared. (Transcript at 77-81.) Gogoe also admitted on cross examination that during this time, James Fendrick, a vice president of EOS, the manufacturer of the EOS P700 (Transcript at 75), discussed with Synergeering the mixing of the material that Synergeering used in its laser sintering process (Transcript at 77). Next, Gogoe admitted that another former employee of Synergeering, Alex Dick, was also familiar with the compound and the mixing of materials at Synergeering, and that he left Synergeering to work for EOS. (Transcript at 77-78.)

---

[8] Fudo explained that in his initial report, he used actual data for 2005 and 2006, but then projected lost profits for 2007 and beyond. When questioned on cross examination about the information used in his report, Fudo stated that using updated information would be helpful in bridging the gap between estimates and actual information, but it is not clear that he in fact relied on later available actual information when he subsequently revised his initial report. (Transcript at 137-38.)

The strong inference from the testimony is that the trade secrets of Synergeering regarding the mixing of materials for its laser sintering process had become information known in the industry by 2007. Even if the mixing of the materials was developed by Synergeering, with its former employees, personnel of EOS, and the Debtor, all having knowledge of Synergeering's mixing process, and with other companies now acquiring EOS P700 machines from EOS, the evidence does not support the assertion that Synergeering's laser sintering process was unknown to anyone else in the industry after 2006. Gogoe admitted that at some point there were other competitors to Synergeering, in addition to Jonatek, for some of the same projects that Synergeering was bidding on, and that there were other companies throughout the country that had obtained laser sintering devices. (Transcript at 80-81.)

The Court is persuaded that Fudo's testimony regarding Synergeering's lost profits during 2005 and 2006 is supported by a reliable foundation, but his testimony regarding its lost profits during 2007 is not. Therefore, as to the first component of damages described by Fudo, the Court accepts his estimate of lost profits for the years 2005 and 2006. During his testimony at trial, Fudo did not break down his estimate of lost profits for 2005, 2006 and 2007. However, the page marked as "Exhibit 2 (2012 Update)" to his written report (Exhibit 7) does contain a break-down of his calculation by month from November, 2005 through December, 2007. According to "Exhibit 2 (2012 Update)" to Fudo's report, Fudo calculates Synergeering's lost profits for November, 2005 through December, 2006 to total $399,335.00. That calculation does not include any statutory interest added back in by Fudo because Fudo's reason for adding such interest (i.e., statutory interest in Michigan) is not supported by any fact in the record. The Court accepts Fudo's estimate of Synergeering's lost profits for November, 2005 through December, 2006, but gives no weight to

Fudo's estimate of Synergeering's lost profits for 2007. Fudo's estimate of lost profits for that year is simply too attenuated and speculative, and is not supported by a reliable foundation.[9]

(2) Expert testimony regarding erosion in
<u>market prices from 2005 through 2007</u>

The second component of damages estimated by Fudo consists of erosion in market prices experienced by Synergeering from November, 2005 through December, 2007. Fudo estimated this amount to be $352,654.00. (Transcript at 126.) Fudo explained that he looked at Synergeering's prices prior to November, 2005 and then compared them to Synergeering's prices after November, 2005. Fudo performed a calculation to measure the difference and then applied a 20% discount rate, similar to the method he used in calculating Synergeering's lost profits for the same period of time. Fudo acknowledged that he did not do any research regarding pricing trends in the automotive industry during this period of time but instead explained that he attributed all of Synergeering's price erosion during this period of time to Jonatek entering the market based upon his understanding that Jonatek was Synergeering's only competition in the market. (Transcript at 146). In short, Fudo's opinion assumes that any erosion of Synergeering's prices over these years must have been because of Jonatek.

The Court is not persuaded that Fudo's estimate of this second component of damages, consisting of price erosion for the years 2005 through 2007, is supported by a reliable foundation.

---

[9] Although Exhibit 7 was admitted into evidence, there was very little testimony about it during the trial. Exhibit 7 contains many pages and calculations that were not explained or even referred to during Fudo's testimony. The Court has reviewed all of Exhibit 7, but gives no weight to those pages that contain calculations or data that are not self explanatory or were not explained by Fudo during the trial. In addition, in considering the weight to be given to Fudo's estimates of damages, the Court has primarily focused on Fudo's testimony at trial and examined Exhibit 7 only to assist the Court in understanding that testimony.

-31-

There is no evidence in this record regarding pricing trends in the automotive industry during this period of time nor any evidence regarding any facts or data that might have influenced pricing during this time. There is just an assumption, based entirely on what Gogoe told Fudo, that all of Synergeering's price erosion was caused by Jonatek. That conclusory statement does not provide a reliable foundation for Fudo's opinion. Even accepting as fact that Synergeering's prices did erode during the years 2005 through 2007, there is not sufficient evidence in the record to conclude that the cause of this erosion was the Debtor's MUTSA violations. The Court gives no weight to Fudo's estimate on this component of Synergeering's damages.

(3) Expert testimony regarding both lost profits from loss of sales<br>volume and price erosion for the years 2008 through 2012

The third component of damages estimated by Fudo consists of a combination of lost profits from loss of sales volume and price erosion for the years 2008 through 2012. Fudo estimated this amount to be $1,940,953.00. (Transcript at 128.) As with his calculation for Synergeering's lost profits for the 2005 through 2007 time period, Fudo assumed that there were no other competitors to Synergeering during this time. He explained his reasoning as follows:

> The reason that I looked at the period from 2008 to 2012, back in 2007 was because it was my understanding and thus my assumption that Mr. Gogoe's market or his -- his product life cycle would have lasted for approximately five more years before it would have been either made obsolete or Mr. Gogoe had -- would have decided to -- move on to something else. (Transcript at 118.)

Fudo admitted that he did no independent research of his own to determine whether there were any competitors of Synergeering during this period. (Transcript at 142-43.) Nor did he contact EOS, the manufacturer of the P700 laser sintering machine, to determine whether it had sold any other P700s throughout the country. When asked on cross-examination whether Gogoe had provided him with any data to support his assumption that there were no competitors of

-32-

Synergeering, Fudo stated: "I don't know about data. That assumption is based on conversations more than data." (Transcript at 144.)

Even if there were no other competitors of Synergeering in late 2005, there is no evidence in the record of a five year "product life cycle" for Synergeering's parts. Nor is there any evidence in the record that there would not be any competitor of Synergeering during that five year period even conceding that there were no competitors of Synergeering when Jonatek first started doing business. Fudo makes the assumption that not only did Jonatek take business from Synergeering in 2005, 2006 and 2007, but that Jonatek would continue to take business from Synergeering in the years following, all the way through the entire time that Jonatek was operating and even continuing after Jonatek went out of business.

The Court considers Fudo's opinion on this third component of damage to be entirely speculative and unsupported either by facts in the record or data of the type reasonably relied upon by experts in Fudo's industry. Therefore, the Court gives no weight to Fudo's opinion on this component of Synergeering's alleged damages.

### (4) Expert testimony regarding out-of-pocket expenses

The fourth and final component of damages estimated by Fudo consists of out-of-pocket expenses incurred by Synergeering related to advertising, marketing and professional fees. Fudo described these damages as "expenses that would not have been incurred but for the theft of the trade secrets." (Transcript at 129.) Fudo testified that he began with the figure of $809,000.00, because that is the amount of these expenses Gogoe had added up through December, 2011. Fudo then discounted this amount by 20%. Fudo calculated the loss to be $617,620.00. (Transcript at 130-31.)

Fudo's opinion regarding the out-of-pocket damages is essentially a regurgitation of the amounts that Gogoe told Fudo that Synergeering had to spend on advertising, marketing and professional fees because of Synergeering's litigation with the Debtor. For advertising and marketing expenses, Fudo testified that he looked at what Synergeering was spending prior to November, 2005, compared it with Synergeering's advertising and marketing expenses incurred after November, 2005 through December, 2011, and then added up the difference. Fudo's opinion that the Debtor caused all of these incremental increases in such expenditures all the way up through December, 2011, is not based upon any reliable foundation. For professional fees, Fudo simply accepted the figure shown on the bills provided to him by Gogoe. Fudo did not analyze or examine these bills to see what they included. In short, Fudo's testimony regarding this fourth component of damages merely parrots Gogoe's assertion that Synergeering incurred all of these expenses. That is not an expert opinion based upon a reliable foundation. The Court gives no weight to Fudo's opinion on this component of Synergeering's damages.

To recap its findings regarding Fudo's testimony, the Court concludes that Fudo is an expert, but not all of his opinions are grounded on a reliable foundation. The Court accepts Fudo's testimony with respect to his estimate of damages for lost profits for the years 2005 and 2006, and finds that Synergeering is entitled to those damages in the amount of $399,335.00. Fudo's expert opinion with regard to those damages is based upon a reliable foundation. However, the Court gives no weight to Fudo's remaining opinions of Synergeering's damages because they are not based upon a reliable foundation consisting either of facts in the record or the type of information shown to be reasonably relied upon by experts in this field. Because the facts and data Fudo used in calculating these remaining components of damage were flawed, but his general methodology in his calculations

-34-

was not, the Court is not required to exclude Fudo's testimony, but may instead consider such flaws in deciding the weight to be given to these portions of Fudo's opinion. Therefore, the Court denies the Debtor's motion in limine.

(5) Other evidence of damages

Although Synergeering relied primarily on Fudo's testimony to quantify its damages, it did not rely entirely on Fudo's testimony. Gogoe testified that Synergeering incurred out-of-pocket expenses directly caused by the Debtor's willful and malicious injury in the aggregate amount of $809,938.00. (Transcript at 54-55.) In support of Gogoe's testimony, Synergeering introduced several exhibits, but did not provide any testimony explaining or even referring to a number of those exhibits (i.e., Exhibits 19 - 25). Gogoe did testify extensively about Exhibit 17. He explained that Exhibit 17 was made up of all of the bills paid by Synergeering that were related to the Debtor, Jonatek and Synergeering's litigation with the Debtor and Jonatek. In Gogoe's words, Exhibit 17 is intended to be a summary of all "Jonatzke related stuff." (Transcript at 108.)

Exhibit 17 has three basic categories: (i) $694,449.97 of attorney fees paid to eight separate law firms; (ii) $102,443.18 paid to three separate consulting firms; and (iii) miscellaneous expenses of $13,055.39. The Court accepts Gogoe's unrefuted testimony that Exhibit 17 represents all of Synergeering's bills for "Jonatzke related stuff." But that does not mean that all of Exhibit 17 is recoverable under MUTSA, nor does it mean that all of Exhibit 17 is a debt that was caused by a willful and malicious injury.

The Court will address the attorney fees in a separate section of this opinion.

As for the three consulting firms, Gogoe did not offer much testimony, but he did introduce bills to show what Synergeering paid each of these firms. Exhibit 11 consists of bills for Spectrum

-35-

Computer Forensics, a forensic computer firm. The only testimony that Gogoe provided about Spectrum Computer Forensics was that it is in the business of forensic computer analysis and that Synergeering retained this firm during the litigation. (Transcript at 59.) That does not establish either that its bills were actual damages caused by the Debtor's MUTSA violations, or that these bills represent a debt caused by a willful and malicious injury. Exhibit 12 consists of bills for Fudo's firm, BBP Partners, a forensic accounting firm. Gogoe testified that BBP Partners was hired by Synergeering during the State Court Lawsuit. By itself, that testimony does not establish either that its bills represent actual damages to Synergeering caused by the Debtor's MUTSA violations or that these bills represent a debt caused by a willful and malicious injury. Exhibit 13 consists of bills for Stout, Risius, Ross, Inc., another forensic accounting firm. Gogoe testified only that Stout, Risius, Ross, Inc. was an "auditing forensic financial firm" (Transcript at 57), hired by Synergeering to monitor the Debtor's compliance with the Settlement Agreement. Once again, that testimony does not prove that its bills represent actual damages sustained by Synergeering as a result of the Debtor's MUTSA violations that Synergeering could have recovered in the State Court Lawsuit or that these bills represent a debt caused by a willful and malicious injury.

Similarly, there is no testimony or other evidence in the record to show that the $13,055.39 of miscellaneous expenses included in Exhibit 17 are actual damages caused by the Debtor's willful and malicious conduct. According to Gogoe, these expenses were incurred by Synergeering during its long running litigation with the Debtor. No doubt they were. But that is not enough to prove that they are actual damages caused by the Debtor's willful and malicious injury to Synergeering or its property.

-36-

In sum, just because Synergeering paid out lots of money during its litigation with the Debtor, that does not by itself mean that Synergeering was entitled to recover all of those payments in the State Court Lawsuit as actual damages under Mich. Comp. Laws Ann. § 445.9104. Synergeering did not offer any testimony or other evidence, nor is there anything in the exhibits themselves, explaining why these sums would have been recoverable in the State Court Lawsuit. The Court finds that Synergeering has not met its burden to prove that any of the non-attorney fee expenses included in Exhibit 17 are recoverable as actual damages.

### Synergeering's attorney fees

Exhibit 17 shows that Synergeering paid total attorney fees of $694,449.97, which it now seeks to recover. This sum includes both Synergeering's attorney fees in the State Court Lawsuit and its attorney fees in this adversary proceeding. Ordinarily, attorney fees are not awarded to a prevailing party in an adversary proceeding, but there are exceptions.

> Awards of attorney fees in bankruptcy cases are governed by the "American Rule." Under the "American Rule," the prevailing litigant is generally not entitled to collect attorney's fees. This default rule, however, can be overcome by statute, contract, or other specific rule of common law authorizing an award of attorney's fees. Such a determination is made by reference to whether the successful plaintiff could have recovered attorney's fees in the applicable non-bankruptcy forum . . . .

Schroeder v. Bennett (In re Bennett), 430 B.R. 463, 472 (Bankr. N.D. Ohio 2010) (citing Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., 549 U.S. 443 (2007)) (other citation omitted).

Before considering Synergeering's request for attorney fees, it is important to also note that there is a difference between fees incurred in liquidating and enforcing a debt prior to a bankruptcy case and fees incurred in prosecuting a non-dischargeability claim in a bankruptcy case. "[T]here is no statutory basis in the Bankruptcy Code that provides generally for attorney's fees for a

prevailing creditor in a § 523 action." <u>Headrick v. Atchison</u> (<u>In re Atchison</u>), 255 B.R. 790, 792

(Bankr. M.D. Fla. 2000) (alteration, quotation marks and citation omitted); <u>see also</u> <u>Martin v. Bank</u>

<u>of Germantown</u> (<u>In re Martin</u>), 761 F.2d 1163, 1167-68 (6th Cir. 1985) (decided under the

Bankruptcy Act's § 523(a)(2)(B), noting that although § 523(d) "explicitly grants fees and costs to

prevailing debtors . . . [t]he congressional failure to award attorney's fees to prevailing creditors was

not accidental"). "Without a statutory right to collect attorney's fees, the creditor must have an

independent right on which to base an award of attorney's fees." <u>Headrick v. Atchison</u>, 255 B.R.

at 792 (quotation marks and citation omitted). "Thus, if a bankruptcy court liquidates a claim and

also determines its dischargeability under the Bankruptcy Code, the liquidated claim may include

an attorney's fee component only if the contract or a statute provides for such an award." <u>Id.</u>[10]

In this case, Synergeering makes no distinction between the attorney fees incurred in the

State Court Lawsuit and the attorney fees incurred in this adversary proceeding. Synergeering

requests an award of all of these fees citing only to a statutory provision under MUTSA authorizing

---

[10] A number of courts that have awarded attorney fees in non-dischargeability actions have relied on the U.S. Supreme Court's decision in <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 215 (1998) (holding "that § 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and that an award of treble damages [under New Jersey law] falls within the scope of the exception" to discharge). However, other courts have cautioned "that <u>Cohen</u> does not itself create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding." <u>Headrick v. Atchison</u>, 255 B.R. at 793. "Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable." <u>Id.</u> at 792-93 (finding <u>Cohen</u> to be inapposite as it was based on a non-dischargeability proceeding for fraud and the treble damages and attorney's fees in that case were "non-dischargeable because they were part of the plaintiff's statutory remedy"); <u>see also</u> <u>Kress v. Kusmierek</u> (<u>In re Kusmierek</u>), 224 B.R. 651, 658 (Bankr. N.D. Ill. 1998) (deciding debt was non-dischargeable under § 523(a)(4), but rejecting the plaintiff's reliance on <u>Cohen v. de la Cruz</u> to award attorney fees in prosecuting the adversary proceeding because "that opinion was specific to § 523(a)(2)(A) of the Bankruptcy Code, and it highlighted the distinction between limiting recovery under § 523(a)(2)(A) to the amount of the money, services, or property obtain[ed] by fraud and the amount of damages actually suffered by the innocent creditor").

recovery of attorney fees. Mich. Comp. Laws Ann. § 445.1905 provides that "the court may award reasonable attorney's fees to the prevailing party" if a "willful and malicious misappropriation [of a trade secret] exists . . . ."

The first element necessary for recovery under this statute is that the party requesting the attorney fees must be the prevailing party. Synergeering meets that requirement. The second element is that there must be a "willful and malicious appropriation of trade secrets." In this case, the State Court Opinion found that the Debtor destroyed the evidence needed to determine whether there was a willful and malicious appropriation of Synergeering's trade secrets. The only inference that can be drawn is that the Debtor did willfully and maliciously appropriate Synergeering's trade secrets. The Court will not permit the Debtor to profit from his deliberate destruction of the evidence that Synergeering could have used to prove the existence of willful and malicious appropriation of trade secrets. That element is met.

But even where, as here, all of the elements of Mich. Comp. Laws Ann. § 445.1905 are present, the statute does not automatically entitle a prevailing party to an award of attorney fees. Instead, it states that the court "may" award attorney fees, thereby making it discretionary and not mandatory. And even where the court exercises such discretion, the statute only permits an award of "reasonable" attorney fees. The Court concludes that the Wayne County Circuit Court would have exercised its discretion and would have made an award of attorney fees to Synergeering under this statute. Given the egregiousness of the Debtor's behavior as found in the State Court Opinion, it is inconceivable to this Court that the Wayne County Circuit Court would have declined to exercise its discretion under this statute. To do so would have allowed the Debtor to avoid a finding

that his MUTSA violations were "willful and malicious" by destroying the evidence necessary for Synergeering to prove those facts.

The statute offers no criteria to determine what is a reasonable attorney fee. Further, there is very little case law regarding how a court should determine a reasonable fee under Mich. Comp. Laws Ann. § 445.1905. In <u>Degussa Admixtures, Inc. v. Burnett</u>, 471 F. Supp.2d 848, 857-58 (W.D. Mich. 2007), the United States District Court for the Western District of Michigan held that, as the prevailing party, the defendant was entitled to attorney fees under § 445.1905, and directed the defendant to file an affidavit. In a subsequent unpublished opinion, the court considered the affidavit and awarded fees, utilizing the lodestar method to determine the reasonableness of the fees. <u>Degussa Admixtures, Inc. v. Burnett</u>, No. 1:05-CV-705, 2007 WL 1041188 (W.D. Mich. Apr. 4, 2007), <u>aff'd</u>, 277 Fed. Appx. 530 (6th Cir. 2008). "The lodestar method is calculated by multiplying the number of hours reasonably expended by the prevailing market rate in the community for an attorney of that skill and expertise." <u>Id.</u> at *2 (citation omitted). To apply a lodestar analysis, the Court must review Gogoe's testimony and Exhibits 14-17 introduced in support of his testimony.

Although Exhibit 17 shows that Synergeering paid nearly $700,000.00 to eight separate law firms, Gogoe's testimony about Synergeering's attorney fees was very brief. He testified that Synergeering hired Butzel, Long to file the State Court Lawsuit, and then hired Brooks, Wilkins, Sharkey & Turco because some of the lawyers at Butzel, Long moved over to that law firm. Gogoe testified that Synergeering hired Ahern, Fleury to handle collections and bankruptcy related matters. Then Gogoe testified that Synergeering hired Kilpatrick & Associates to negotiate a settlement. Next Gogoe testified that Synergeering hired Lewis & Munday as "basically someone who looks into a company and caretakes it to make sure that it's holding to what it's supposed to." (Transcript

-40-

at 61.)  Gogoe testified that Synergeering next hired Miller, Johnson, Snell to conduct a mediation. Next, Gogoe testified that Synergeering hired the Smith Appellate Law Firm, but said only that Synergeering's retention of this law firm was "self explanatory."  (Transcript at 62.)  Finally, although the Honigman, Miller law firm was also shown as having been paid by Synergeering in Exhibit 17, no mention was made of this firm in the testimony.

Gogoe did not explain why it was necessary for Synergeering to hire so many law firms.  Nor did he testify at all about the reasonableness of the attorney fees that Synergeering incurred with any of these law firms.  Synergeering did not offer any evidence of the reasonableness of these attorney fees other than to present the bills for three of the law firms: Butzel, Long; Brooks, Wilkins; and Ahern, Fleury.  To some extent, the Court can conduct a lodestar analysis by examining each of their bills.  However, for those law firms hired and paid by Synergeering, where there are no copies of bills nor any description of the services they rendered, there is simply no evidence in the record from which the Court could conduct a lodestar analysis or otherwise conclude that the fees incurred by Synergeering with those law firms were reasonable.  Therefore, for the five law firms hired by Synergeering for which there are no bills, the Court concludes that Synergeering failed to prove that their fees are reasonable fees that the Wayne County Circuit Court would have awarded to Synergeering as the prevailing party in the State Court Lawsuit.  According to Exhibit 17, those attorney fees total $25,083.12.  They are not recoverable under Mich. Comp. Laws Ann. § 445.1905.

The Butzel, Long fees are backed up by bills (Exhibit 14).  They total $218,093.75.  Those fees cover the period of time from December, 2005 through August, 2008.  Gogoe did not testify one way or the other as to whether he believed the fees were reasonable, nor did Synergeering put in any other evidence regarding these charges.  There is nothing in the record about the attorneys who

performed the services described on these bills, the skill and experience they have, or how their hourly rates were determined. Nor is there any evidence in the record regarding the prevailing market rates in the community for attorneys of similar skill and expertise. That makes it difficult to perform a lodestar analysis.

Before applying a lodestar analysis to determine whether the Butzel, Long fees are recoverable under Mich. Comp. Laws Ann. § 445.1905, it is important to first distinguish between the services rendered in the prosecution of the State Court Lawsuit for the Debtor's MUTSA violations, on the one hand, and the services rendered in monitoring compliance with the Settlement Agreement and litigating over the numerous disputes that arose out of the Settlement Agreement, on the other hand. The Settlement Agreement was made on November 21, 2007, on the eve of the damages trial in Wayne County Circuit Court. Butzel, Long's fees from December, 2005 through November, 2007 total $177,214.94. The services described in its bills for that time clearly relate to prosecution of the Debtor's MUTSA violations in the State Court Lawsuit. However, from December, 2007 through July, 2008, the services described in the Butzel, Long bills, which total $40,878.81, do not appear to be services rendered in prosecuting the Debtor's MUTSA violations in the State Court Lawsuit. The services described on the bills for this time frame all relate to litigation after the Settlement Agreement was made. They are not, in the Court's view, hours reasonably expended by Butzel, Long in the prosecution of the Debtor's MUTSA violations in the State Court Lawsuit. There is no evidence in the record to show that these post-Settlement Agreement attorney fees would have been awardable as reasonable attorney fees under Mich. Comp. Laws Ann. § 445.1905. These fees may have been incurred by Synergeering for "Jonatzke related

stuff," but Synergeering did not prove that the Wayne County Circuit Court would have awarded them to it as the prevailing party in the State Court Lawsuit.

Although Butzel, Long's bills for the period of December, 2005 through November 21, 2007 all appear to relate to Synergeering's prosecution of the State Court Lawsuit, as explained above, the Court is still left with very little information in the record from which it could draw any conclusions about whether the services rendered in that time frame were reasonably expended by the Butzel, Long lawyers in the prosecution of the Debtor's MUTSA violations in the State Court Lawsuit. However, the Debtor did not challenge the reasonableness of either the hourly rates or the reasonableness of the hours expended by Butzel, Long for purposes of a lodestar analysis. After carefully reviewing these bills, considering the nature and complexity of the issues in the State Court Lawsuit, the hours described on the bills, and the Court's extensive familiarity with the hourly rates charged by attorneys in this region with skills and expertise comparable to the attorneys at Butzel, Long, and noting the absence of any objections by the Debtor, the Court finds that Butzel, Long's attorney fees of $177,214.94 are reasonable fees under a lodestar analysis. The Court concludes that Synergeering would have recovered these fees as the prevailing party in the State Court Lawsuit under Mich. Comp. Laws Ann. § 445.1905.

Exhibit 15 consists of the bills for Brooks, Wilkins. They add up to $253,990.88. They cover the period of time from July 1, 2009 through December, 2011. Gogoe testified that he was "comfortable" that all of the bills in Exhibit 15 relate to Jonatek and the Debtor, but did not testify one way or the other about the reasonableness of these fees. There is no identification of who these lawyers are, what their skill and experience is, how their hourly rates were determined, or how they compare with others in the marketplace. Once again, that makes it difficult for the Court to employ

a lodestar analysis. However, there is a larger problem with the Brooks, Wilkins bills. Based upon the dates that these services were rendered, in contrast to much of the Butzel, Long services, it appears that all of the Brooks, Wilkins services were rendered after the State Court Opinion was issued, after the Wayne County Circuit Court found that the Debtor had committed MUTSA violations, and after Synergeering had settled the State Court Lawsuit by entering into the Settlement Agreement. By the time that Brooks, Wilkins was hired in July, 2009, Synergeering had long ago prevailed in the State Court Lawsuit. It is difficult to conceive of how the Brooks, Wilkins fees could constitute reasonable fees for a prevailing party in a MUTSA violation action if all of the fees in question were incurred after Synergeering prevailed in the State Court Lawsuit. The time entries in these bills cover many different subjects, including extensive litigation surrounding the Settlement Agreement, but not services in prosecuting Synergeering's MUTSA claims in the State Court Lawsuit.

Based on the dates that the services were rendered, and without more explanation as to how these fees were caused by the Debtor's MUTSA violations and by the Debtor's willful and malicious conduct, the Court concludes that the attorney fees for Brooks, Wilkins contained in Exhibit 15 are not recoverable as reasonable attorney fees for Synergeering as a prevailing party under Mich. Comp. Laws Ann. § 445.1905. That does not mean that the Court does not believe that these services were rendered, or that Synergeering did not actually incur these expenses with Brooks, Wilkins. It simply means that Synergeering did not prove that these bills represent reasonable attorney fees awardable under MUTSA.

Exhibit 16 consists of the bills of Ahern, Fleury. Like Brooks, Wilkins, the Ahern, Fleury law firm was not even hired by Synergeering until *after* it prevailed in the State Court Lawsuit. The

-44-

Ahern, Fleury fees are even further removed from the State Court Lawsuit than those of Brooks, Wilkins because Ahern, Fleury was not hired until after the Judgment was entered. The services described in the Ahern, Fleury bills begin in November, 2010 and continue through January, 2012. They aggregate the sum of $197,282.22. Gogoe described all of these services as having to "do with the Jonatzke litigation." (Transcript at 60.) A review of Ahern, Fleury's bills in Exhibit 16 shows that many of the services that it performed related to a wide variety of matters involving Synergeering and the Debtor. A significant portion involved the prosecution of this adversary proceeding. The balance was incurred in connection either with pre-bankruptcy actions to enforce the Judgment or other aspects of the Debtor's Chapter 7 bankruptcy case. For example, in addition to this adversary proceeding, Synergeering also filed a separate adversary proceeding, no. 11-4167, that went to trial on May 11, 2011 and resulted in Synergeering obtaining a declaratory judgment with respect to certain property of Jonatek, including a web domain, web site, domain name, email addresses and cell phone numbers. All of the Ahern, Fleury attorney fees for prosecuting that adversary proceeding are included in Exhibit 16.

Undoubtedly, all of the Ahern, Fleury fees incurred by Synergeering in connection with post-Judgment collection actions, the Debtor's Chapter 7 bankruptcy case, and Synergeering's prosecution of its other adversary proceeding, involved "Jonatzke related stuff." But just because Synergeering incurred these legal fees does not mean that they are all recoverable under Mich. Comp. Laws Ann. § 445.1905. The Ahern, Fleury fees were not incurred by Synergeering in the State Court Lawsuit. Further, it was not the Debtor's willful and malicious conduct (i.e., the destruction of evidence) that somehow prevented Synergeering from recovering these fees in the State Court Lawsuit. Mich. Comp. Laws Ann. § 445.1905 authorizes the Court to make an award

of attorney fees in certain circumstances to the prevailing party in the MUTSA action. But no authority has been offered to the Court to support the proposition that all attorney fees forever after incurred by such prevailing party in any litigation with the party who violated MUTSA are retroactively recoverable under Mich. Comp. Laws Ann. § 445.1905.

As explained above, just because Synergeering prevails in seeking a determination of a non-dischargeable debt under § 523(a)(6) of the Bankruptcy Code does not mean that it is entitled to recover its attorney fees incurred in such action. Under the American Rule, each party bears its own attorney fees absent a statute or other authority to the contrary. Here, there is such a statute, Mich. Comp. Laws Ann. § 445.1905. But it only permits Synergeering to recover the Butzel, Long attorney fees incurred by Synergeering as the prevailing party in the State Court Lawsuit. It does not permit Synergeering to recover the Brooks, Wilkins attorney fees or the Ahern, Fleury attorney fees, all of which were incurred long after Synergeering had settled all of its MUTSA claims in the State Court Lawsuit pursuant to the Settlement Agreement.

In sum, the record shows that Synergeering spent an enormous amount in its litigation with the Debtor. According to Gogoe, the total is $809,938.00, including nearly $700,000.00 in attorney fees. That total includes attorney fees for the litigation that led to the State Court Opinion, but it also includes litigation over the Debtor's compliance with the Settlement Agreement (some of which was even adjudicated *against* Synergeering and resulted in sanctions that Synergeering seeks to, in effect, overturn by including here), litigation leading to the Second State Court Opinion, litigation against the Debtor's mother, litigation to enforce the Judgment, litigation in the Debtor's Chapter 7 bankruptcy case, litigation in adversary proceeding no. 11-4167, and litigation in this adversary proceeding. MUTSA permits reasonable attorney fees to be awarded to the prevailing party in the

MUTSA action if a "willful and malicious misappropriation exists." The Court finds that Butzel, Long's fees of $177,214.94 are reasonable and would have been recoverable in the State Court Lawsuit under Mich. Comp. Laws Ann. § 445.1905 but for the Debtor's deliberate destruction of the evidence in that case. The Debtor's willful and malicious conduct in destroying evidence in the State Court Lawsuit prevented Synergeering from proving that the Debtor's MUTSA violations were willful and malicious. The Debtor's conduct thereby prevented Synergeering from recovering reasonable attorney fees under Mich. Comp. Laws Ann. § 445.1905. The Court finds that Synergeering is entitled to a non-dischargeable debt that includes these attorney fees. But there is no evidence in the record to show that any of Synergeering's other attorney fees are recoverable from the Debtor under this statute or under any other authority. Therefore, they are not included in Synergeering's non-dischargeable debt.

### Conclusion

Synergeering's complaint in this adversary proceeding seeks a determination that the Judgment of $3,000,000.00, "plus additional damages," is non-dischargeable. During the trial, based in large part on Fudo's testimony, Synergeering increased the amount it seeks as a non-dischargeable debt. In its post-trial brief (docket entry no. 68), Synergeering requests that the Court enter a non-dischargeable judgment in its favor for a total of $4,764,639.00. The Court agrees with Synergeering that it has proven a non-dischargeable debt under § 523(a)(6) of the Bankruptcy Code, but not for the amount requested. The evidence in the record demonstrates that the Debtor's willful and malicious injury to Synergeering's property (i.e., the Debtor's deliberate destruction of evidence) prevented Synergeering from proving and recovering in the State Court Lawsuit actual damages of $399,335.00 and reasonable attorney fees of $177,214.94, for a total of $576,549.94.

-47-

However, there is one other issue to consider before determining the amount of the non-dischargeable debt under § 523(a)(6).  The Debtor testified without contradiction that he made payments to Synergeering under the Settlement Agreement.  All of these payments were made after the State Court Opinion was issued, but before the Judgment was entered for breach of the Settlement Agreement.  During closing arguments, the Court inquired of counsel as to whether and how these payments should be applied.  Synergeering's counsel conceded that they "would have to be applied somewhere."  The Court agrees.  The Judgment had not been entered when the Debtor made these payments, and the only debt owed by the Debtor to Synergeering at the time of these payments was the Settlement Agreement, which compensated Synergeering for the Debtor's MUTSA violations, as found in the State Court Opinion.  Therefore, the Court holds that the Debtor is entitled to a credit for these payments against the debt caused by his willful and malicious conduct.

The Debtor testified that he paid $300,000.00 under the Settlement Agreement (Transcript at 26-27).  But then he testified that he "maybe" paid $360,000.00.  Because the Debtor is the party that benefits from any credit, the Debtor has burden of proof in establishing the amount of the credit.  The Court is persuaded that the Debtor has met that burden as to $300,000.00, but no more.  Since there is no evidence in the record to show that this sum was paid for any debt other than the debt created by the Debtor's MUTSA violations, the Court will credit this sum against the Debtor's liability to Synergeering and reduce the amount of the non-dischargeable debt from $576,549.94 to

$276,549.94. The Court will enter a judgement determining a non-dischargeable debt in that amount. The Court will also enter a separate order denying the Debtor's motion in limine.

.

Signed on August 24, 2012

                                    /s/ Phillip J. Shefferly
                                    Phillip J. Shefferly
                                    United States Bankruptcy Judge